IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| WILMER JOHNSON,<br>         *Plaintiff,*<br>   v.<br>STATE FARM MUTUAL AUTOMOBILE INSURANCE CO.,<br>         *Defendant.* | CASE NO. 3:10-cv-00035<br><br>MEMORANDUM OPINION<br><br>JUDGE NORMAN K. MOON |

This matter is before the Court upon Defendant's Motion for Summary Judgment (docket no. 13). I have fully considered the arguments and authorities set forth in the parties' filings, as well as those presented at the June 6, 2011 hearing. For the following reasons, I will grant Defendant's motion in its entirety.

**I. BACKGROUND**

On Christmas Eve in 2006, Plaintiff Wilmer Johnson ("Plaintiff" or "Wilmer") was riding as a passenger in a 1995 Pontiac Sunfire (the "car") driven by his brother John Johnson ("John") when the car crashed in Orange County, Virginia, injuring Wilmer. The owner of the car was Gladys Gilmore (now Gladys Davis) ("Gladys"), and the car was insured under a motor vehicle insurance policy with State Farm Mutual Automobile Insurance Co. ("Defendant" or "State Farm"). John was found liable to Wilmer for his injuries, and a judgment for $185,000 plus interest was entered. Unable to collect from John, Wilmer brings this action against State Farm seeking $185,000 plus interest and reasonable attorney's fees and expenses for State Farm's alleged failure to meet its obligations under the policy it issued to Gladys.

The automobile insurance policy issued by State Farm to Gladys that was in effect at the time of the accident listed Gladys as the named person insured and provided bodily injury limits of liability of $50,000 each person, $100,000 each occurrence. Under the policy, State Farm was obligated to "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages" because of bodily injury sustained by any person "arising out of the ownership, maintenance or use of the owned automobile or any non-owned automobile." State Farm was also obligated to "defend any suit alleging such bodily injury . . . and seeking damages which are payable under the terms of this policy." The policy listed as an "owned automobile" the 1995 Pontiac Sunfire, as well as Gladys's other, primary car, a 1998 Oldsmobile Cutlass. With respect to an owned automobile, an "insured" includes "any other person using such automobile with the permission of the named insured, provided his actual operation or (if he is not operating) his other actual use thereof is within the scope of such permission." The policy clause must satisfy the provisions of the Virginia omnibus statute, which requires coverage for "the named insured, and any other person using or responsible for the use of the motor vehicle . . . with the expressed or implied consent of the named insured." Va. Code. Ann. § 38.2-2204(A).

At issue is whether John had express or implied consent from Gladys to operate her automobile on the night of the accident. Gladys and John were previously married but divorced in the early 1980s. In the two to three months prior to the accident, John testified that he visited Gladys's house regularly and performed handiwork and other tasks for Gladys.[1] Although John had his own house, he stated that he stayed overnight four or more nights per week at Gladys's residence, but Gladys testified to only one overnight visit. John did not have any firm plans regarding the future of their relationship, and Gladys testified that she did not intend to get back

---

[1] For example, John stated that he cleaned, mowed the lawn, refinished a room at the house, cooked for his grandson who was staying there, and cared for Gladys's elderly father. In turn, Gladys allowed John to remove trees from her property to resell.

together with him. During this period, Gladys's Pontiac "wasn't running right" and had not been driven for months. John had never driven Gladys's Pontiac alone and had driven Gladys's Oldsmobile by himself once or twice, but only with her express permission and to run errands for her benefit. In reference to his use of the Oldsmobile, John testified as follows:

> A  . . . [T]hat was her car, I always defer, I always asked. You know, I never took the car without her not knowing, I never would.
>
> Q  So every time you used her car before the accident you asked for her permission to use it?
>
> A  If I used it, yes, sir, I would. I would never, I mean. I mean, I didn't feel that oh, I can do whatever I want, you know.
>   That's your vehicle, I'm going to ask, you know. I'm going to run out to the store to get some gas or she'll say, hey, can you pick up me this or pick up that for me when you go out and I go and get it.
>
> Q  And that happened once or twice before this accident?
>
> A  Yeah.

(John Dep. 64:1-17, Apr. 14, 2011.)

Gladys and John reached an agreement that John would repair the Pontiac at no cost to Gladys.[2] Gladys worked as a caregiver for a private individual and was often away from her own house for several days at a time. She gave John the car keys before she left for work, and instructed John to leave the keys under the car's floor mat when he was finished. Gladys testified that it was her understanding that John would complete the repairs on her property, without taking the car out of her yard. John testified that it was his understanding that he would take the car off the property to repair it and return it to her once he finished fixing it.

The sequence of events in the week prior to the accident as described by Gladys and John differ in material ways. According to Gladys, she gave John the keys to the car on December 19.

---

[2] The parties dispute whether Gladys or John first suggested that John repair the car. This fact is not material.

She told him the spark plugs and spark plug wires needed repair, and that she had already purchased replacement parts, which she had stored in the car. She then returned on December 20 to find that the repairs had been made and the car was running properly. It is Gladys's testimony that she then "mistakenly" left the car parked at home with the keys in the car's ignition and returned to work in her Oldsmobile. Gladys testified that she did not know that the car had been moved from her yard because she was not at home during that time period. Gladys remained away from home until, on Christmas Day, she received notice that John had been in an accident involving her car.

According to John, Gladys and John went together to purchase replacement parts on December 20. Later that day, Gladys gave him the car keys, and he took the car to his home. While there, he worked on the car, which required more work than replacement of the spark plugs and wires. John testified that he completed the repairs on Christmas Eve, and then attempted to return the car to Gladys's property. He stated that he brought the car by her house, but she was not home, so he waited for her and tried calling her, but he was unable to reach her. John left phone messages for her notifying her that he was taking the car to his brother Richard's house.[3] Unbeknownst to John, Gladys was at her boyfriend's house that day, and Gladys asserts she had her phone turned off. John drove the car to Richard's house, and then drove it back to Gladys's property about an hour later to see if she had returned, but she had not. John testified that he then drove the car back to Richard's house, where he played pool and had an alcoholic drink.[4] Close to midnight on Christmas Eve, John attested that he left Richard's house driving Gladys's car with Wilmer as a passenger in order to go to Wilmer's house on the mountain to pick up a pair of shoes for Wilmer that would be more appropriate for "going out," possibly to a

---

[3] Richard's surname could not be located in the record.
[4] John testified that he was later convicted of driving under the influence for his operation of the vehicle on the night of the accident.

club in Charlottesville. When asked why he got in the car with Wilmer, John stated "Christmas Eve people go out and do and I mean, try to do things, they enjoy themselves, I presume." (John Dep. 89:5-9.) While en route to Wilmer's house, the accident occurred.

There is some indication in the record that, prior to the accident, Gladys had considered transferring ownership of the car to John as a gift. Wilmer testified that Gladys had told him that she was planning on giving the car to John, and John "heard" after the accident that such a transfer had been contemplated. Gladys denied having told anyone that she had that intention. Regardless, John stated that prior to the accident, he had no knowledge of any plans to give the car to him.

## II. APPLICABLE LAW

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to preclude summary judgment, the dispute about a material fact must be "'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). However, if the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250. "As to materiality . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

Once a motion for summary judgment is properly made and supported, the non-moving party may not rely merely on allegations or denials in its own pleading, rather it must set out "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S.

317, 324 (1986). When considering a summary judgment motion, the court must view the facts in the light most favorable to the party opposing the motion. *Austin v. Clark Equip. Co.*, 48 F.3d 833, 835 (4th Cir. 1995). "[T]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

In this diversity action, Virginia law governs the claims.

### III. DISCUSSION

The question is whether at the time of the accident John's use of the car was within the scope of Gladys's permission within the meaning of the omnibus coverage clause of the policy. The omnibus statute requires coverage for "the named insured, and any other person using or responsible for the use of the motor vehicle . . . with the expressed or implied consent of the named insured." Va. Code. Ann. § 38.2-2204(A). For permission to be express, "it must be of an affirmative character, directly and distinctly stated, clear and outspoken, and not merely implied or left to inference." *Aetna Cas. & Sur. Co. v. Anderson*, 200 Va. 385, 391, 105 S.E.2d 869, 873 (1958) (quoting *Hinton v. Indemnity Ins. Co. of N. Am.*, 175 Va. 205, 213, 8 S.E.2d 279, 283 (1940)). Express permission to use a vehicle for one purpose does not imply permission for all other purposes. *Hartford Fire Ins. Co. v. Davis*, 246 Va. 495, 498, 436 S.E.2d 429, 431 (1993). Implied permission involves "an inference arising from a course of conduct or relationship between the parties, in which there is mutual acquiescence or lack of objection under circumstances signifying assent." *Hinton*, 175 Va. at 214, 8 S.E.2d at 283. Implied permission for personal use may arise from a prior course of conduct between the parties. *Davis*, 246 Va. at 500, 436 S.E.2d at 432; *Hartford Accident & Indem. Co. v. Peach*, 193 Va. 260, 266, 68 S.E.2d

520, 523 (1952). The burden of proof is on the party seeking to bring himself (or another) within the omnibus coverage clause of the policy. *See Davis*, 246 Va. at 498, 436 S.E.2d at 431.

The parties agree that John did not have express permission to drive the car from Richard's house to Wilmer's house on the night of the accident, but dispute whether such permission can be implied. Viewing the facts in the light most favorable to Plaintiff, Plaintiff has established that John at least had implied permission to remove the car from Gladys's property insofar as was necessary to repair it and return it. John was arguably operating within the scope of this implied permission when he first returned the car to Gladys's house on Christmas Eve, after having completed repairing it. Even though John had access to Gladys's house, and regularly stayed overnight there, John chose not to leave the car at the property when he discovered that Gladys was not home. Instead, he drove it to Richard's house so that he could socialize with him while waiting for Gladys to return. After a second, unsuccessful attempt to locate Gladys at her house, he drove her car back to Richard's to spend more time with his brother. Then he attempted to drive the car to Wilmer's house, with the intent that John and Wilmer would use the car as transportation to go out that night. No reasonable inference can be drawn that John was still in the course of attempting to return the car to Gladys when he embarked with Wilmer to go out close to midnight that evening. No conclusion can be drawn from the facts other than that he was using the car for personal reasons unrelated to repair and return of the car.

The next issue I must address, then, is whether permission for personal use of the car may be implied from the facts, viewing them in the light most favorable to Plaintiff. Defendant argues that two cases decided by the Supreme Court of Virginia on the issue of implied permission for a mechanic to use a motor vehicle for personal reasons involve similar facts and

support Defendant's position that John did not have implied permission to use the car for personal reasons here. First, in *Peach*, the insured had accepted the offer of a coworker, who was a mechanic, to repair his vehicle. 193 Va. at 263, 68 S.E.2d at 521. The mechanic did not have his own repair shop, and there was no express understanding between the parties regarding when the work was to be done or where any necessary parts would be procured. *Id.* at 263, 68 S.E.2d at 521-22. The mechanic did not request use of the car for personal purposes, nor did the vehicle owner grant such permission. Nothing was said by either party concerning whether the mechanic would drive the vehicle. Further, the parties had no prior course of dealing involving use of the vehicle. *Id.* at 262, 68 S.E.2d at 521. The accident in *Peach* occurred at about 11:00 p.m. the same day the car keys were provided to the mechanic. The record did not disclose the purpose of the trip but it did show that, at the time of the accident, the mechanic had done no work on the car and had not purchased any repair parts for it. In addition, he was intoxicated when the collision occurred. *Id.* at 263, 68 S.E.2d at 522. Finding this evidence insufficient to establish implied permissive use, the court emphasized the fact that there was no evidence showing that the purpose of the trip was related to the repair of the vehicle, or that any work on the vehicle had been attempted at the time of the accident. Rather, "at the time of the accident [the mechanic] was on some venture of his own" which constituted a clear deviation from the specified purpose for which the car was delivered to him. *Id.* at 265, 68 S.E.2d at 523. Thus, the court concluded that, as a matter of law, the mechanic had failed to meet his burden of proving implied permissive use. *Id.* at 263, 68 S.E.2d at 522.

In *Davis*, the Supreme Court of Virginia relied upon *Peach*. *Davis* involved an insured who authorized a mechanic to take her vehicle to the garage of the mechanic's friend to do repair

work there. 246 Va. at 496-97, 436 S.E.2d at 430.[5]  On one or two previous occasions the mechanic had repaired the insured's vehicle at her home. *Id.*  The court found that the mechanic was given permission to drive the vehicle for the purpose of fixing it, with no limitations on where he could obtain repair parts, where he could test drive the vehicle, or how long he could possess the vehicle. *Id.* at 497, 436 S.E.2d at 430.  Although the insured had said nothing to the mechanic regarding his personal use of the vehicle, it was her belief that most of the repairs would take place at the garage. *Id.*  The accident occurred at 11:10 p.m. the day after the mechanic had taken possession of the vehicle, while the mechanic was driving three women to their home in Chesapeake, Virginia. *Id.*  There was testimony that the mechanic had not been working on the vehicle that night. *Id.*  On these facts, the court held that the mechanic did not have implied permission to use the vehicle on the night of the accident.  It reasoned that the mechanic's trip to Chesapeake was not related in any way to the repair of the vehicle, and the mechanic was not given any permission to drive the vehicle for his personal use. *Id.* at 499, 436 S.E.2d at 431-32.  Further, the mechanic had not performed any work on the car that night. *Id.*

Defendant argues that *Peach* and *Davis* establish that permission to repair a motor vehicle does not imply permission to use the vehicle for personal purposes.  Even if John had permission to operate the car insofar as was necessary to repair it, Defendant contends that his use of the car on the evening of the accident "was personal and completely unrelated to making repairs to the Pontiac," just as the court found the actions of the mechanics in *Peach* and *Davis* to be. (Def.'s Br. Supp. Mot. Summ. J. 20.)  Plaintiff argues that *Peach* and *Davis* do not control this outcome because those cases concerned the boundaries of implied permission between a customer and her mechanic, whereas here, John and Gladys had a close, ongoing personal

---

[5] The mechanic worked out of Norfolk, Virginia, and his friend's garage was located on Granby Street, presumably in Norfolk.  246 Va. at 496-97, 436 S.E.2d at 430.

relationship, and John repaired the car as a favor to Gladys for no charge. Certainly, expectations as to use of a vehicle may be different where a mechanic is enlisted to repair one's vehicle, as opposed to one's ex-husband and friend. Peach and Davis establish the limits of implied consent in "a single transaction" for repair of a vehicle, but they do not address the scope of permission where the parties had a prior course of conduct involving the vehicle. *See Peach*, 193 Va. at 266, 68 S.E.2d at 523.

The mere fact that John and Gladys had a personal relationship and John was staying at her house several nights a week, however, is insufficient to get Plaintiff past summary judgment. Plaintiff fails to show why, in this case, John would be permitted broader license to use the car because of their ongoing relationship. It was John's understanding of their arrangement to repair the car that he would take the car off the property to repair it and return it to her *once he finished fixing it*. His actions were consistent with this understanding. Upon completing repairs, John returned the car to Gladys's property and then waited for her to arrive. He left messages for her indicating that he was attempting to return the car. After some time, he took the car to Richard's house, but he returned thereafter to make a second attempt to leave the car with Gladys. It was only after spending a good part of the day trying to return the repaired car to Gladys that John apparently abandoned hope of effecting the return and instead decided to use the vehicle on a venture of his own late that evening. There is also no prior course of dealing from which consent to use the car to socialize with family the evening of the accident could be implied. Although John had been spending significant time with Gladys at her property for two to three months, he never used the Pontiac alone, and only used the Oldsmobile alone once or twice and with Gladys's express permission to do so. Even then, he did not take the Oldsmobile for personal use, only to perform errands for Gladys. John testified that he "didn't feel that oh, I can do

whatever I want" with Gladys's Oldsmobile. (John Dep. 64:1-17.) Even viewing the evidence in the light most favorable to Plaintiff, Gladys's expectation was that John would not use her vehicles without her express permission, and when she gave him authority to repair the Pontiac, she expected him to return the car once he completed the repairs. His permission to use the car to make repairs did not imply permission for all other purposes, including socializing with family and going out on Christmas Eve. *See Davis*, 246 Va. at 498, 436 S.E.2d at 431.[6]

The cases cited by Plaintiff in support of his argument are unavailing. In *Hinton*, there was sufficient evidence for a jury to find that Ernest Ball, Sr., whose permission was needed for use of a company vehicle, acquiesced in the personal use of the vehicle by his son's friend where evidence showed the following: the friend had previously used the car without objection; the friend was "welcomed" in Ball, Sr.'s household in part due to "his ability to drive a car;" Ball, Sr. knew or should have known that the friend was using the car on that occasion and did not object; and Ball, Sr.'s attitude towards use of the car by the friend indicated "acquiescence and tacit consent." 175 Va. at 216, 8 S.E.2d at 284. But here Plaintiff cannot point to any evidence that shows "mutual acquiescence or lack of objection under circumstances signifying assent." *Id.* at 214, 8 S.E.2d at 283. To the contrary, the evidence shows that John had never used either of Gladys's cars without express permission and he understood that he was to return the Pontiac upon completion of the repairs. Gladys had no knowledge that John was using her car to drive from Richard's house to Wilmer's residence, so no inference can be drawn from her failure to object.

In *Nationwide Mutual Insurance Co. v. Vaughn*, the court found implied permission for a friend of the owner of a car to take a short ride in the owner's car without asking him. 307 F.

---

[6] Likewise, though the evidence suggests that Gladys had considered giving John the car, she had not transferred it as of the date of the accident, nor had she notified John of her intentions such that John might have felt warranted in using the car as if it was his own.

Supp. 805 (W.D. Va. 1969). *Vaughn* is distinguishable from the case at bar for several reasons. First, on the day of the accident, the friend already had possession of the car keys because he had just returned from using the vehicle to pick up another friend's clothes from the cleaners. *Id.* at 808. From this trip, the court inferred that "if [the owner] would allow [the friend] to run an errand for someone else, [the owner] would allow his good friend the use of the car for a short trip of his own." *Id.* at 809. Second, the prior course of conduct between the parties revealed that the owner had "liberally allowed [the friend] the use of his car" and his previous car, allowing his friend to take the owner's cars to the friend's house to keep overnight. *Id.* at 808. When the friend had sole possession of the car, he "could use it for whatever purpose he wished." *Id.* The court found that there was "an unwritten understanding" between them that the owner "could use the car whenever he wished as long as [the owner] was not going to use it." *Id.* Finally, the understanding between the owner and the friend on the day of the accident was that the friend could use the car but had to have it back in time for the owner to attend a party. *Id.* at 809. In contrast, John was not permitted such leeway with use of Gladys's vehicles; in fact, he had not used either of her cars for his own personal reasons. John rarely used her vehicles at all, and when he did, their understanding was that John's use was limited to the purpose for which he was given permission, whether it was to run errands or to make repairs.

Plaintiff also presents *Coureas v. Allstate Insurance Co.* for consideration. 198 Va. 77, 92 S.E.2d 378 (1956). There, the court held that where the driver of the vehicle and the owner were "living together as husband and wife prior to, at the time of, and subsequent to a collision in which the wife was driving the insured vehicle, the jury is entitled to find, absent proof to the contrary, that at the time of the accident the wife was driving with her husband's implied consent." *Id.* at 82, 92 S.E.2d at 382. No argument can be made that John and Gladys were

living together as husband and wife. John kept another residence, there were no firm plans for John and Gladys to reunite, and Gladys had a boyfriend at the time. In any case, John did not have consent to use Gladys's automobiles without her permission.

Finally, Plaintiff's contention that consent can be implied because John was on "a reasonable, minor deviation from the express permission he had been granted" must be rejected. (Pl.'s Br. Opp. 11.) John's use of the car, after 11:30 p.m., for the purpose of going to his brother's house so they could go out that night, after drinking, does not seem any more reasonable than the personal trips taken by the mechanics in *Peach* and *Davis*. *See Peach*, 193 Va. at 263, 68 S.E.2d at 522 (driving car at 11:00 p.m. while intoxicated); *Davis*, 246 Va. at 497, 436 S.E.2d at 430 (driving car at 11:10 p.m. to take three women to their home). This matter is unlike *Robinson v. Fidelity & Casualty Co. of New York*, where Jean Wills, the car's possessor, gave Will Beasley, who she was dating, permission to drive the vehicle from the garage where it was being repaired to her home. 190 Va. 368, 371, 57 S.E.2d 93, 94 (1950).[7] Instead of driving the car directly to her residence, Beasley took a route longer by two to three miles in order to stop by his brother's house on his way to Wills's. *Id.* at 372, 57 S.E.2d at 95. The court found that because Wills and Beasley had "a very close relationship," it was "within the province of a jury to determine whether, while he was doing her the favor of bringing her car to her, she would object to his going two or three miles out of the direct route to attend to a personal errand." *Id.* at 373, 57 S.E.2d at 95. Here, John had not merely stopped at his brother's house on his way to return the car to Gladys. To the contrary, when he could not locate Gladys, he decided to use her car to take his brother to his house in preparation for going out that night. There is no evidence

---

[7] Although Wills was not the owner of the car, the owner had "turned the car over to her for her own general use during his absence," and therefore, "she stood in the shoes of the owner." 190 Va. at 371, 57 S.E.2d at 94.

that he was still in the course of attempting to return the car when he embarked with Wilmer that evening.

Because Wilmer has failed to supply specific facts showing there is a genuine issue as to whether consent to use the car could be implied, I must grant judgment in favor of State Farm. In the complaint, Wilmer also alleged that State Farm's "refusal to honor the provisions of its contract with Gladys Gilmore and its resulting obligations to the plaintiff was not made in good faith." (Pl.'s First Am. Compl. ¶ 10.) In his briefing, Wilmer conceded that his bad faith claim is dependent on John having used the car with express or implied consent. (Pl.'s Br. Opp. 1.) Therefore, that claim fails as well.

### IV. Conclusion

For the reasons set forth herein, I will grant Defendant's motion for summary judgment. This case will be stricken from the Court's active docket. An appropriate order will follow.

The Clerk of the Court is hereby directed to send a certified copy of this memorandum opinion and the accompanying order to all counsel of record.

It is so ORDERED.

Entered this ___15th___ day of June, 2011.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE